FILED

2018 SEP -7 P 3:30

SUSAN Y. SOONG
CLERK US DISTRICT COURT
NO. DIST. OF CA

1   Anthony Oliver., Plaintiff Pro Se
2   1502 Benton Blvd, # 5108
3   Savannah, Georgia 31407
    (912) 220-5842 (Telephone)
4   Anthony.oliver29@gmail.com

5   *Plaintiff Appearing Pro Se*

6

7   **IN THE UNITED STATES DISTRICT COURT**
    **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
8

9   ANTHONY OLIVER,                              ) **CV. 18 5505**
                                                 )
10                          Plaintiff,           ) **COMPLAINT FOR**   **LB**
                                                 ) **DAMAGES AND**
11  v.                                           ) **INJUNCTIVE RELIEF**
                                                 )
12                                               )
                                                 )
13                                               )
    LYFT, Inc., a California Corporation;        ) **DEMAND FOR JURY TRIAL**
14  LOGAN GREEN, an individual;                  )
15  JOHN ZIMMER, an individual;                  )
    KRISTIN SVERCHEK and DOES                    )
16  1 through 10, inclusive.                     )
                                                 )
17                          Defendants.          )
                                                 )
18                                               )
                                                 )
19                                               )
                                                 )
20  _____          )

21

22

23

24

25

26

27

28  **Complaint for Damages**

## COMPLAINT FOR DAMAGES

Plaintiff Anthony Oliver ("Plaintiff") brings this complaint for damages against the Defendants' for their criminal and civil misconduct who have founded a ride share network called Lyft, Inc., ("LYFT"). This is a civil action brought by Plaintiff is a current LYFT driver in the State of Georgia, and is seeking disgorgement of unjust enrichment obtained by Lyft, Inc. without legal entitlement, through deceptive business practices and fraud.

## PARTIES

1.      Plaintiff Anthony Oliver is a citizen of the State of Georgia.

2.      Defendant is Lyft Inc., ("LYFT"), is a Delaware corporation with its corporate headquarters and primary place of business in San Francisco, California. LYFT operates in at least 30 other states of the United States of America.

3.      Defendant Logan Green, ("GREEN") is a citizen of the State of California.

4.      Defendant John Zimmer, ("ZIMMER") is a citizen of the State of California.

5.      Defendant Kristin Sverchek, ("SVERCHEK") is a citizen of the State of California.

6.      Plaintiff alleges on information and belief that: (1) each Defendant acted in all matters relevant to this action as the agent of the other Defendant and carried out joint business plans and operations; and (2) the acts and omissions of each Defendant are legally attributable to the other Defendant.

7.      Plaintiff is currently ignorant of the true name(s) and the capacities, whether individual, corporate, associate, or otherwise, of the Defendants sued herein under the fictious names DOES 1 through 10, inclusive, and therefore, sues such civil Defendants by such fictitious names. Plaintiff will seek leave to

1  amend this Complaint to allege the true names and capacities of said fictitiously
2  named Doe Defendants is legally responsible in some manner for the events and
3  is also sued pursuant to California Code of Civil Procedure 474.

4      8.    Plaintiff is informed and believes and thereon alleges that
5  Defendants, including the fictitious Doe Defendants, were at all times acting as
6  actual agents, conspirators, ostensible agents, partners and/or joint ventures and
7  their employees of all other Defendants, and that all acts alleged herein occurred
8  within the course and scope of said agency, employment, partnership, and joint
9  venture, conspiracy, or enterprise, and with the express and/or implied
10 permission, with such knowledge, consent, authorization and ratification of their
11 co-Defendants however, each of these allegations are deemed "alternative"
12 theories whenever not doing so would result in a contraction with the other
13 allegations.  Whenever the Complaint refers to any act of the Defendants, the
14 allegations shall be deemed to mean the act of those Defendants names in the
15 particular cause of action, and each of them, acting individually, jointly and
16 severally. Defendants Lyft, Inc., Logan Green, John Zimmer, and Kristin
17 Sverchek will often be referred to as Racketeering Defendants or RICO.

18                          **JURISDICTION AND VENUE**
19      9.    This Court has jurisdiction pursuant to 28 U.S.C. §1331 (federal
20 question), 28 U.S.C. §1367 (supplemental jurisdiction) and for state law
21 claims. Subject-matter jurisdiction also arises under 28 U.S.C. § 1331 based
22 upon the federal antitrust claims asserted under the Sherman Act, 15 U.S.C. §
23 1, et seq., and Racketeering Influenced and Corrupt Organizations Act
24 ("RICO") claims asserted under 18 U.S.C. § 1961 et seq. The Court also has
25 personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b) and
26 (d), and Cal. Code. Civ. P. § 410.10.

27
28

## INTRADISTRICT ASSIGNMENT

10.     Pursuant to L.R. 3-2(c) and (d), this action is properly assigned to the San Francisco Division of the Northern District of California because a substantial portion of the events giving rise to the dispute occurred in San Francisco, California.

10.     Venue is proper in this District because: (a) the acts and transactions occurred here; (b) the injuries to Plaintiff arise from this Judicial District; and (c) Defendant transacts business here. Injunctive relief is available pursuant to 28 U.S.C. § 2201-2202.

## ALLEGATIONS COMMON TO ALL COUNTS

11.     "LYFT" is a familiar smartphone-app driven taxi service. While characterizing its drivers as independent contractors, Lyft exercises enormous control over its drivers' 'independent' businesses, such as instantly terminating a driver's 'businesses at the drop of a hat.

12.     LYFT's smartphone app and business model are highly similar to the smartphone app and business model of the earlier and highly-successful 'ridesharing' service, Uber.

13.     LYFT competes with Uber in the same market; and each of these two leading "transportation network companies" must compete against taxi service.

14.     Since its 2012 launch, LYFT has enjoyed astounding growth, achieving a market value of $11 billion in less than 5 years' time. LYFT's said growth rate is remarkable, particularly in light of Uber's 3-year head-start, viral growth rate, and competitive pricing, designed to undercut taxi prices in all but the most extreme markets, by an average of 30%.

15.    Uber fares are so competitive with taxi fares that, in 2018, competition from Uber had driven the free-market resale price of a New York City Taxi Medallion (license) from a high of well over $1,000,000 in 2013 to a little better than $150,000 in 2018.

16.    In order to gain market entry against LYFT and compete with taxis, like Uber, Lyft regularly set its standard prices to average about 30% below taxi prices.

17.    As the new company in town, in order to quickly increase its market share, LYFT had to attract and retain new and used drivers, including drivers who drove for Uber or had the option of driving for Uber. To attract its rapidly-growing staff, which has swollen to nearly 1,000,000 drivers today, LYFT advertising conveys the impression of being driver-friendly and of offering drivers a better deal. And, to a degree, this is true. LYFT was the first major app-driven ride-sharing service to allow drivers to accept and retain tips. LYFT advertised this over the Internet and through email to prospective drivers.

16.    However, in order to attract drivers while producing extra to fuel its rapid growth, advertised more than it delivered, resorting to what can only be characterized as deceptive business acts and practices. For example, Plaintiff noticed that he first made about $ 900.00 per week. But, after the first three to four weeks his referrals from Lyft resulted in shorter, lower-profit ride referrals which only generated $ 600.00 to $700.00 per week gross (less gasoline costs and 100,000 mile per-year car expenses). Lyft also gave new drivers an extra hour of prime-time pricing in order to boost the new driver's impression of earning more than he would. LYFT establishes their own set of rules; however, LYFT does not follow the very rules in place.

17.   As a classic example of the criminal and civil activity carried out by Defendants LYFT, GREEN, ZIMMER and SVERCHEK, Plaintiff also lost income when LYFT referred him a scheduled ride on May 13, 2018.

18.   On this date, LYFT referred Plaintiff to pick up a passenger named "Matt" in the downtown Savannah Georgia area. Once Plaintiff accepted the ride request from LYFT, Plaintiff then proceeded to drive the passenger to two counties over to Bulloch County, State of Georiga. From Savannah Georgia to Statesboro Georgia is well over an hour each way.  At 12:59 a.m., Plaintiff picked up "Matt" to drop him off in Statesboro. After securing the passenger, Plaintiff drove to Statesboro where the mileage was exactly 58.39 miles, 1 hour and 12 minutes from Savannah. Plaintiff then dropped "Matt" off at his home and then proceeded back to Savannah. LYFT charged "Matt" $ 72.59. *(See Exhibit "A.")*

19.   From the $ 72.59, LYFT, GREEN, ZIMMER, SVERCHEK then deducted their fees of $ 27.99 for doing absolutely nothing, and leaving LYFT to pay Plaintiff only $ 44.60 for a round trip that costed Plaintiff half of the said $ 44.60 just in fuel to get back to the City of Savannah. Most particularly here, and relevant to the present suit, LYFT, GREEN, ZIMMER, and SVERCHEK also attracted Plaintiff, as it attracts all drivers, by also advertising, and in its Terms of Service agreement promising, drivers 80% of the fare, when in fact LYFT paid the Plaintiff far less. At no time did Plaintiff Anthony Oliver ever give consent to be cheated by the RICO Defendants LYFT, GREEN, ZIMMER and SVERCHEK.

20.   On information and belief, Lyft will assert that the 20% constituted its "commission" under the contract with the driver, and that the additional charge to the passenger constituted its "service fee" under a different contract. The fact is that LYFT deceives and continues to deceive the Plaintiff and all

other drivers as to the amount of the fare and retains funds earned by the driver. This is a deceptive business practice. Until April 9, 2018, LYFT, GREEN, ZIMMER and SVERCHEK did not disclose to the driver that his 'independent businesses had generated the higher fare than he knew.

21.     In addition to this criminal activity, LYFT, GREEN, ZIMMER and SVERCHEK set in motion what is often called the "Lyft Platform Fee" and also a "Service Fee."

22.     To enhance their criminal enterprise, Defendants LYFT, GREEN, ZIMMER and SVERCHEK deploy an additional scam on the passengers by incorporating fraud into the LYFT application. For instance, LYFT charges passengers a "Lyft Platform Fee" and also a "Service Fee" which are identical charges that LYFT, GREEN, ZIMMER and SVERCHEK uses to bring in more money, but the Defendants simply reclassify these two fees by changing the name as to each one. As an example, the "Lyft Platform Fee" is a fee that all passengers must pay when requests a ride share from LYFT. Further, passengers must also pay a service fee which is not only the same fee as the "Lyft Platform Fee," but is also general the same amount. By committing this fraud, its simple. This is a classic example how LYFT has breached their own contract with the Plaintiff. Again, LYFT, GREEN, ZIMMER, and SVERCHEK advertises that they pay the Plaintiff 75 % percent of the total fare leaving LYFT to purportedly take only 25 % percent.

23.     It allows LYFT to not only cheat the driver out of profits, but it also allows the RICO Defendants LYFT, GREEN, ZIMMER and SVERCHEK to defraud consumers like passengers, and it allows the Defendants' to unjustly enrich themselves.

24.     As another classic example, LYFT referred Plaintiff to pick up a passenger on September 2, 2018 in Savannah Georgia. A passenger requested a

ride from one part of the City of Savannah to another part. After picking up the passenger, Plaintiff drove the passenger across the County of Chatham where the ride last 8 minutes. LYFT charged the passenger a total of $ 6.15. LYFT deducted their fees of $ 3.53 with a breakdown of a service fee of $ 2.65 for the "Service Fee" and $ .88 cents for a "Lyft Platform Fee" for a total of $ 3.53.

25.    From the total amount of $ 6.15, LYFT, GREEN, ZIMMER, and SVERCHEK only paid Plaintiff $ 2.62 for driving across the County, and a ride that last 8 minutes. From there, LYFT deducted more than the standard % 25 percent that LYFT, GREEN, ZIMMER and SVERCHEK advertises causing damage to the Plaintiff. Once again, LYFT has cheated and continues to cheat the Plaintiff as once again as like for the past five to six months of Plaintiffs' very employment with LYFT, Plaintiff has suffered an economic damage in an amount to be proven at trial. As again, both the "Lyft Platform Fee" and the Service Fee" are one and in the same. *(See Exhibit "C.")*.

26.    LYFT, GREEN, ZIMMER and SVERCHEK may argue that there has been no misrepresentation and no fraud-- that its additional service fees are under a separate contract with the driver or the Plaintiff – that the service fee was a charge to the rider only, under a rider contract that is entirely separate and distinct from its contract with the driver -- and that this in no way decreases the driver's net earnings. This characterization is disingenuous and false because LYFT knows very well that its fares are limited in relation to taxi fares. Standard fares were set at a level that would avoid exceeding taxi fares in all but the most extreme location (Manhattan New York, where average traffic speed is very slow and taxi fares are lower).

27.    Recently, on April 9, 2018, in order to avoid further liability from suits like this, LYFT, GREEN, ZIMMER, and SVERCHEK raised its fares and eliminated its commission, providing increased driver income, and halted its

**Complaint for Damages**                    8

practice of misrepresenting to the driver the fare amount and its practice of misrepresenting that it took only 20% of the fare. Until April 9, although LYFT and Uber raise fares during "premium" or "surge" times of day and charge a premium for luxury cars, both companies set their fares to be lower than taxi fares – on average by about 30%.

28.     LYFT's deceptive business acts and practices have unjustly enriched, Inc. in California at the expense of Plaintiff and its other drivers in California and throughout the Country.

29.     As months went by, Plaintiff noticed that LYFT began to deduct a few dollars from Plaintiffs' weekly payout amount. Plaintiff noticed that LYFT would deduct an average of $ 3.00 to $ 4.00 dollars from the total amount to be paid to Plaintiff for his work at the end of the week. As Plaintiff began to complain to LYFT, Plaintiff began to be retaliated against personally by LYFT, ZIMMER, GREEN, and SVERCHEK.

30.     In the past two months, Plaintiff began to experience several ride reduction requests. On most days, LYFT would not refer any rides to the Plaintiff due to Plaintiffs' complaints, state bar complaints against SVERCHEK and demands for arbitration.

31.     As a classic example, just several days after Plaintiff referred Defendants SVERCHEK to the State Bar of California, Plaintiff was subject to days and weeks of retaliation.

32.     On August 18, 2018, Plaintiff drove for LYFT the night before and decided to drive again in early morning hours. Plaintiff logged into the LYFT dash board and LYFT referred a ride request to the Plaintiff. After Plaintiff provided that ride, Plaintiff was automatically logged out by LYFT and was told through an instant message that Plaintiff could not drive any longer and need to go home and sleep for at least 6 hours. However, Plaintiff had already

logged out and slept for 6 hours prior to logging in. Plaintiff then contacted and emailed LYFT and threatened LYFT, GREEN, ZIMMER, and SVERCHEK with a notice again. As a direct result of the actions of each of the Defendants, the Plaintiff lost a full days pay, plus lost an earning opportunity for Plaintiff to receive a bonus.

33.    LYFT continued to retaliate against the Plaintiff. After Plaintiff purportedly went home and slept for 6 hours, Plaintiff then went to log back in to the LYFT driver dash board, and was told that he could not log in a drive for LYFT because LYFT stated that Plaintiff was in a "catastrophic" car accident with another car and that LYFT demanded pictures, documentation and copies of any and all police and insurance reports. LYFT went on to tell Plaintiff that he could not drive until Plaintiff provided evidence from a car accident. The Plaintiff contacted LYFT phone and driver support and a LYFT representative stated that Plaintiff "hit three parked cars, four people, and drove off fleeing the scene of an accident." LYFT also demanded that Plaintiff turn himself into police immediately.  However, the results were staggering. Plaintiff was never involved in any car accident. Plaintiff took pictures of his car at the request of LYFT and emailed them to LYFT corporate office in San Francisco. Plaintiff emailed photos and video showing no accident, and not one scratch on vehicle registered by Plaintiff to drive with LYFT. Further, Plaintiff called the Savannah Police Department and a police officer arrived and informed Plaintiff that his vehicle was never in an accident, no accident reported against the Plaintiff and the officer conducted a national search of the vehicles plate number and determined that Plaintiff was never in an accident. As a result of the actions, fraud, and conspiracy committed by LYFT, GREEN, ZIMMER, and SVERCHEK, Plaintiff lost a day's pay, and was denied a weekly bonus as

Plaintiff would have been entitled to a $ 200.00 bonus from LYFT for fulfilling his weekly quota. Additionally, Plaintiff lost a days pay.

34.     LYFT's deceptive business acts and practices also violate California's Unfair Competition Law and constitute fraudulent inducement to employment and to contract.

35.     LYFT, GREEN, ZIMMER, and SVERCHEK has generated most of its wealth with the use of the wrongfully obtained funds. The additional funds LYFT has obtained by deceiving its drivers has fueled LYFT's business expansion and built the considerable present value of Lyft, Inc., allowing LYFT to bring in $ 36 billion in the last fiscal year.

36.     Those savings translate into higher net revenues which attract investment capital, attract additional and better technical and marketing staff, and provide for better advertising, skyrocketing LYFT's market value to $101 billion, in less than 5 years.

37.     In fact, upon information and belief, discovery and trial are likely to show that the extra funds LYFT has obtained by its deceptive practices constitute the entire value of the LYFT company. The Lyft, Inc. stock is now valued at $11 billion while Lyft lost approximately $250 million in 2017 on gross revenue of about $750,000 million. Without the additional approximately 23% of the fare LYFT obtains by deception (doubling Lyft's share of the fare from 20% to 43%), LYFT's stock would be worth nothing, or merely a fraction of its present value.

38.     In this technical era, the sleight-of-hand is accomplished by computer science. When a customer requests a ride, the Lyft computer checks its database and determines fare by reference to the LYFT database of average

competing taxi fares, whether computed by time, distance, or a combination of the two; then adjusts its price accordingly, which results in a fare averaging 30% less than the average predicted taxi fare. In contrast, the human driver does not instantly know the corresponding taxi fare. Thus, the human driver does not know that LYFT is taking 43% of the fare, not 20%. [1]

39.     As LYFT fares average 30% less than taxi fares, the driver expects to receive an amount that turns out to be about **56%** of the comparable taxi fare (80% of the Lyft fare, which is itself about 70% of the comparable taxi fare). But, in the typical example stated herein, the driver receives only about **40% or far less** of the comparable taxi fare (an average of about 57% of the Lyft fare, which itself is about 70% of the taxi rate). Thus, the drivers were until April 9, 2018, being shorted about 16% of the share an objective driver would said to be reasonably expected to receive.

40.     LYFT fares are limited by taxi fares and an average of 30% below taxi fares. Thus, the lower percentage of the fare represents more than a reference figure; it constituted a concrete, actual loss in income to the driver, which Lyft retained. LYFT invested those funds in its own growth and thereby used the funds obtained by deception to build its company infrastructure and generate its high stock price. The drivers are entitled to the share of the company built with their promised income which Lyft wrongfully retained.

41.     LYFT's statements to drivers are deceptive because they tend to deceive the prospective customer who may buy their service; therefore, at the very least, these deceptive acts and practices violate the California Unfair

---

[1]  https://www.lyft.com/terms/driver-addendum

Competition Law under both the unfair business practice prong and under the fraudulent business practice prong, establishing a basis for simple restitution of the funds retained by LYFT without legal entitlement.

42.    Moreover, as drivers do rely on these misrepresentations, these practices constitution intentional or negligent misrepresentation under California law, providing a basis for fraud damages.

43.    Plaintiff is entitled to disgorgement of the unjust enrichment LYFT has obtained unlawfully at the expense of the Plaintiff, including both simple restitution and the increased value of LYFT's stock attributable to the extra approximately 23% of the fare revenue that belongs to the Plaintiff that LYFT has retained. The Plaintiff is entitled to the investment value of those funds as an interest in Lyft, Inc., as stock or stock options in Lyft, Inc., because the funds were used to increase the stock value.

44.    In the alternative, Plaintiff is entitled to damages for LYFT's own misrepresentation or fraudulent inducement; at the very least, the Plaintiff is entitled to simple restitution.

45.    LYFT and Uber claim that the drivers are independent business people, and that the company merely provides services to the driver and to its customer. This characterization is highly-questionable due to the degree of control these companies exercise over the driver and over the driver's interactions and relations with customers.

46.    Drivers have no control over LYFT's practices because LYFT sets the fares, breaks the fares, steals from the Plaintiff, diverts rides from the Plaintiff, refers the rides, hires and fires the riders at will, and also otherwise

exercises such extensive control over the drivers' work and business that the relationship can only be characterized as that of employer and employee.

47.     Together, GREEN, ZIMMER, and SVERCHEK, along with unknown investors and board of directors have taken the ride sharing business by surprise to try and compete with their rival Uber. To do so, the RICO Defendants GREEN, ZIMMER, and SVERCHEK will cut corners, cheat passengers, drivers and even the State and Federal governments should the time come.

48.     Together, they command the entire ride sharing market for public transportation throughout the United States and other countries, and a drastic significant share of the overall luxury proceeds get pocketed by the Defendants in an effort to surpass Uber.

49.     After paying out almost $ 150 million towards several class action lawsuits in the United States, Lyft, GREEN, ZIMMER and SVERCHEK have to not only compete with Uber, but they must also cheat their own employees in any way possible even if that means stealing from the poor so that Peter can pay Paul.

50.     As a direct result of the actions, fraud, concealment of a material fact, and other unknown criminal and civil activity committed by each of the Defendants, Plaintiff is

## COUNT ONE – VIOLATIONS OF FEDERAL ANTITRUST LAW
### Plaintiff v. All Defendants

51.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

52.     Plaintiff brings this claim against all Defendants, Lyft, Inc., Logan Green, John Zimmer and Kristin Sverchek.

53.     Defendants and their unknown co-conspirators entered into a combination and/or conspiracy in restraint of trade, and thereby violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

54.     Specifically, Defendants conspired and agreed to restrain trade and commerce by cheating its own employees by advertising that they pay Lyft drivers more money that would entice drivers to not drive for Uber, but rather Lyft.

55.     The Defendants engaged in numerous anticompetitive activities, as alleged herein, in order to create and undertake this unlawful combination or conspiracy. These activities and acts were done in furtherance of the conspiracy and/or combination in restraint of trade, and were undertaken, authorized, or ordered by officers, employees, and agents of Defendants while engaged in the management of Defendants' business.

56.     The collusion, conspiracy, and combination between the Defendants' and each of them extended to numerous areas of financial gain to reap billion-dollar profits.

57.     These activities were directed at the citizens of the United States of America, as well as the actual Lyft drivers themselves including the Plaintiff.

58.     The effects of this collusion were multifarious, but each effect increased the anticompetitive result. Defendants' conspiracy eliminated or substantially reduced competition, leaving limited consumer choice against Uber. Not only was competition eliminated or restrained between Lyft and

Uber, but the collusion between them eliminated or suppressed competition from other ride share networks.

59.     As a direct and proximate result of Defendants' conduct, Plaintiff has been injured in his business and property, and will continue to be injured if Defendants' conduct is not enjoined.

60.     Plaintiff is entitled to injunctive relief against the Defendants' under the Clayton Act.

61.     Defendants' conduct is punishable and shall be deemed guilty of a felony, and on conviction thereof, shall be punished by a fine not exceeding the amount of $ 100,000 if a corporation, and $ 1,000 by a person.

**COUNT TWO – VIOLATIONS OF FEDERAL UNFAIR COMPETITION AND FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a)**
**Plaintiff v. All Defendants**

62.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

63.     Defendants' actions described above and specifically, without limitation, Defendants' use of trademark, and confusingly similar variations thereof, in commerce to advertise, market, and sell their software products, application, and services throughout the United States including the States of California and Georgia; their use of misleading misrepresentations regarding payment to Lyft drivers such as the Plaintiff. Defendants have, had and continue to have knowledge, participation, and inducement thereof, which constitute unfair competition and false advertising in violation of 15 U.S.C. § 1125(a).

64.     Defendants' false advertise that Lyft pays their drivers such as the Plaintiff more money when in actually they do not. In fact, Lyft falsely advertises that they pay the Plaintiff % 75 percent when in fact they don't.

65.     The Defendants' made the false statements knowing them to be false.

66.     Plaintiff was and still is likely to be misled and deceived by Defendants' representations regarding Plaintiff's regarding actual payment to Lyft drivers in the United States of America.

67.     Defendants knew or should have known that their statements were false or likely to mislead.

68.     As an actual and proximate result of Defendants' willful and intentional actions, Plaintiff has suffered damages in an amount to be determined at trial, and unless Defendants are enjoined, Plaintiff will continue to suffer irreparable harm and damage to its business, reputation, and goodwill.

69.     Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to damages for Defendants' Lanham Act violations, an accounting for profits made by Defendants on sales as well as recovery of the costs of this action. Furthermore, Plaintiff is informed and believes, and on that basis alleges, that Defendants' conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Plaintiff to recover additional damages and fees pursuant to 15 U.S.C. § 1117.

## COUNT THREE – VIOLATIONS OF O.C.G.A § 10-1-370 et seq., Plaintiff v. All Defendants

70.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

71.     Defendants and the Plaintiff are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), GA. CODE. ANN. § 10-1- 371(5).

72.     The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and

"engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." GA. CODE. ANN. § 10-1-372(a). By causing damage to the Plaintiff, Defendants conduct constitutes unfair and deceptive acts or practices in the course of a business, trade or commerce in violation of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1 370 et seq.,

73. Defendants' knew or should have known that its conduct violated the Georgia UDTPA.

74. Plaintiff has suffered ascertainable loss caused by the Defendants' said misrepresentations and its concealment of and failure to disclose material information.

75. As a direct and proximate result of the Defendants' violations of the Georgia UDTPA, Plaintiff has suffered injury-in-fact and/or actual damage.

76. Plaintiff seeks an order enjoining the Defendants' unfair, unlawful, and/or deceptive practices, and any other just and proper relief available under the Georgia UDTPA per GA. CODE. ANN § 10-1-373.

## COUNT FOUR – VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200, et seq
### Plaintiff v. All Defendants

77. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

79. This claim is based upon sections 17203 and 17204 of the California Business and Professions Code to obtain restitution, disgorgement, declaratory and injunctive relief, and all other remedies available for violations of section 17200 of the Business and Professions Code, the California Unfair Competition Act.

80. Plaintiff is a "person" within the meaning of 22 California Business and Professions Code section 17201.

81.   The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.

82.   A business act or practice is "unfair" under the California Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer is outweighed by the gravity of the harm to the alleged victims. Any business act or practice is "fraudulent" under the UCL if it is likely to deceive the Plaintiff and members of the consuming public. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

83.   The conduct complained of herein, including but not limited to business acts and practices, violates Business and Professions Code section 17200.  The business acts and practices alleged herein display Defendants' committed, common, continuous, and continuing course of conduct constituting unfair competition by unfair, unlawful, and-or fraudulent business acts and practices within the meaning of section 17200, et seq. as described herein, and are unfair to consumers in the States of California, Georgia, and all other states within the meaning of section 17200.

84.   Plaintiff has suffered actual injury in the form of at least one type of injury described herein, losing money or property as a result of unfair competition as described above, including Defendants' unlawful, unfair, or fraudulent business acts and practices.

85.   By such violations of the UCL, Lyft, Inc. has enriched itself to the detriment of drivers and prospective drivers. Therefore, the Plaintiff is entitled to simple restitution of the funds obtained from them by Lyft, Inc. through these unfair, fraudulent, and unlawful business acts and practices. The gravity of the harm to Plaintiff resulting from these unfair acts and practices outweighs any

conceivable justifications or motives of LYFT for engaging in such deceptive acts and practices.

86.     By committing the acts and practices alleged herein, Defendants and each of them engaged in, and continue to engage in, unfair business practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and Plaintiff continues to suffer harm from these actions. Therefore, Plaintiff is entitled to injunctive relief prohibiting the continuation of such business acts and practices.

87.     Plaintiff asks the Court to order Defendants to pay restitution to Plaintiff in the amount of his losses based on violations of the UCL, to pay costs, and to enjoin Defendants from continuing to violate the UCL as alleged herein.

### COUNT FIVE – VIOLATION OF UNJUST ENRICHMENT
**Plaintiff v. All Defendants**

88.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

89.     Plaintiff hereby pleads this claim in the alternative. Because of the misconduct described herein, Defendants Lyft, Logan Green, John Zimmer, and Kristin Sverchek has been unjustly enriched at the expense of Plaintiff having received and retained payments from Lyft Riders beyond those promised in Lyft's advertising and in its other communications and agreements with its drivers.

90.     Specifically, Defendant Lyft, Logan Green, John Zimmer, and Kristin Sverchek has retained a larger portion of the passenger fare than they promised they would retain and is therefore without legal entitlement to retain those funds.  This unjust enrichment has directly benefited Defendants.

91.     Lyft, Logan Green, John Zimmer, and Kristin Sverchek knew or should have known that Plaintiff and other drivers would likely be deceived as to the amount of the fare and as to the driver's percentage share of the full fare.

92.     The funds obtained by Lyft from the drivers' labor without legal entitlement was used by Lyft to increase Lyft's company value as the value of the common and preferred stock of Lyft, Inc.  Therefore, Plaintiff is entitled to disgorgement of the increased value of Lyft stock attributable to the funds Lyft has obtained without legal entitlement.

93.     In the alternative, the Plaintiff is entitled to ownership of the portion of Lyft, Inc. stock attributable to the value of the stock increased from the wrongfully obtained funds.

## COUNT SIX – NEGLIGENT MISREPRESENTATION
### Plaintiff v. All Defendants

94.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

95.     Defendants Lyft, Inc., Logan Green, John Zimmer, and Kristin Sverchek has engaged in fraudulent inducement to employment and to Contract, and Intentional and Negligent Misrepresentation as described above, and such misrepresentations have actually and proximately caused harm to Plaintiff.

96.     Defendants' failure to inform Plaintiff that the amount being represented to him as the full fare charged the Riders was not in fact the full fare, but rather an amount less than what the Rider was charged, was a willful and intentional misrepresentation of fact made with the intent that Plaintiff relied or would rely on same.

97.     Such misrepresentations fraudulently induced Plaintiff to enter into an employment relationship with Lyft, Inc. and to contract with Lyft, initially and repeatedly.

**Complaint for Damages**                     21

98.     Plaintiff entered into employment and into contracts with Lyft and performed services thereunder in reliance on the representations made by Lyft that it would pay them an amount equal to the fare it charged the rider less Lyft's "Commission" percentage (20% or 25% of the fare, the applicable percentage being based on when the driver contracted with Lyft) and any applicable charges such as service fees, cancellation fees, damage fees, tolls and/or surcharges for each ride he/they successfully completed. The statements referred to herein, made by Lyft, were false; Lyft knew them to be false at the time such statements were made and intended the drivers to rely upon such statements; the drivers relied upon such statements to their detriment, accepting employment while being paid a lower level of pay than promised; and drivers were harmed by such misrepresentations and by drivers' reliance upon such misrepresentations.

99.     Thus, as a direct and further proximate, and foreseeable result of misrepresentations, Plaintiff has been damaged ins an amount to be determined according to proof at the time of trial.

**COUNT SEVEN – VIOLATIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE §§ 2223 & 2224**
**Plaintiff v. Lyft, Inc., a California Corporation**

100.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

101.     Defendant Lyft, Inc. has wrongfully detained money, property, and property value that rightfully belongs to the Plaintiff. Therefore, Defendant Lyft, Inc. is an involuntary trustee of such property for the benefit of the owner.

102.     Furthermore, Lyft, Inc. has obtained money rightfully belonging to Plaintiff by fraud, accident, mistake, and undue influence, and by the violation of a trust by a fiduciary, and other wrongful acts, and is without other and better rights to such money, and is therefore an involuntary trustee of the money gained, for the benefit of the Plaintiff. In addition, Lyft, Inc. has invested such

money in the company, resulting in an increase in the wealth of the company as measured by its stock price and market value. This increased stock price and company value also rightfully belongs to Plaintiff, and Lyft, Inc. is without other and better rights to such increased company value, and is therefore an involuntary trustee of the increased company value, for the benefit of the said Plaintiff.

103.    Therefore, Plaintiff asks the Court to declare that Lyft, Inc. is an involuntary trustee of said money gained and of said increased company value and stock and impose a constructive trust over said money and over Lyft, Inc. common stock in an amount sufficient to return to Plaintiff common stock in the amount that Plaintiff would own had he invested said funds in Lyft, Inc. common stock at the time they earned it.

///
///
///

# REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Anthony Oliver prays for the following relief:

1. A determination that Defendants' conduct as alleged herein is unlawful and/or unfair;

2. An award to Plaintiff of actual, compensatory, and punitive damages, as proven at trial pursuant to Cal.Civ.Code.P. § 3294;

3. An award to Plaintiff of restitution of all monies deducted by Defendants as a result of their unlawful and/or unfair business practices;

4. An order enjoining Defendants from engaging in the unlawful and/or unfair business practices described herein;

5. An award to Plaintiff of all fees, costs, and pre- and post-judgment interest; and

6. Restitution in an amount to be determined at trial;

7. Disgorgement of unjust enrichment in an amount to be determined at trial;

8. The imposition of a constructive trust over funds rightfully belonging to the Plaintiff wrongfully retained by Lyft, Inc traced to include property and increased property value obtained by investment and re-investment of such funds;

9. An order from this Court requesting that the United States Attorneys' office investigate the Defendants and their criminal and civil misconduct;

10. An order from this Court directing the California Secretary of State to suspend any and all business licenses of the Defendants;

**Complaint for Damages**                         24

11.   An order of this Court directing the Defendants, their agents, employees and their co-conspirators not to retaliate against the Plaintiff during this litigation;

12.   Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: September 7, 2018                Respectfully submitted,

ANTHONY OLIVER – PLAINTIFF

By: _____

Anthony Oliver, Pro Se

Email:  Anthony.oliver29@gmail.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A
# 1 through 4

.ıll Boost 🛜　　　　　10:32 AM　　　　🡥 ✳ 68% 🔋

Done　　　🔒 lyft.com　　　　　↻

☰　　　　　lyft　　　　　😊

← Back to Ride Receipt

## May 13 2018 - 12:55 AM

# $44.60



Map data ©2018 Google | Terms of Use

O **12:59 AM Pick-up**
　Requested at 12:55 AM

O **2:01 AM Drop-off**

## You Received

Earnings　　　　　　　　　　$44.60

## Total　　　　　$44.60

Your earnings always start with a base rate. Then they're
calculated with time and distance rates specific to your

•₁∷₁ Boost 📶    **10:33 AM**    ⬈ ✳ 68% 🔋
🔒 lyft.com

≡        

## You Received

Earnings                                    $44.60

---

## Total                                    **$44.60**

Your earnings always start with a base rate. Then they're calculated with time and distance rates specific to your city, plus any tips and bonuses earned. This total will also include any additional tolls. You can see your city's rates here.

## Passenger(s) Paid

Ride Payments                               $72.59

---

## Total                                    **$72.59**

This is the total amount the passenger(s) paid, which varies based on demand and includes any tips, tolls, third-party fees, and the Service Fee.

## Lyft Received

Lyft Platform Fee                           $25.34

Service Fee                                 $2.65

---

## Total                                    **$27.99**

If this total is positive, it goes toward growing the Lyft business and increasing demand for your rides. If it's negative, we're covering the difference between your earnings and what your passenger(s) paid.

**Complaint for Damages**              **28**



**Route**

● **Pick-up**

● **Drop-off**

**Earnings**

| Earnings (55.39mi, 1h 1m) | $44.60 |
| --- | --- |

| **Total** | **$44.60** |
| --- | --- |

View Earnings Breakdown

Rating Not Available

Get help

▪️ Boost 📶          **10:33 AM**          🧭 ✳️ 68% 🔋
🔒 lyft.com

☰                    

## Passenger(s) Paid

Ride Payments                              $72.59

## Total                                    **$72.59**

This is the total amount the passenger(s) paid, which varies based on demand and includes any tips, tolls, third-party fees, and the Service Fee.

## Lyft Received

Lyft Platform Fee                          $25.34

Service Fee                                $2.65

## Total                                    **$27.99**

If this total is positive, it goes toward growing the Lyft business and increasing demand for your rides. If it's negative, we're covering the difference between your earnings and what your passenger(s) paid.

Ride Receipt #: 5af7c555aee1100cb43ddf40

Help Center

**DISCOVER**

Safety

Drive

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

# 1 through 3

.ıl Boost 🛜　　　　　　　10:38 PM　　　　　　🖈 ⁕ 69% 🔋

Done　　　　　🔒 **lyft.com**　　　　　　↻

☰　　　　　　　　**lyft**　　　　　　　

## ← Back to Ride Receipt

## Sep 02 2018 - 10:24 PM

# $2.62



○ **10:25 PM Pick-up**
　Requested at 10:24 PM

○ **10:29 PM Drop-off**

## You Received

　　　　　

▪️📶 Boost 📶          **10:38 PM**          🧭 ⁑ 69% 🔋
                    🔒 lyft.com

☰                                        

## You Received

Earnings                                    $2.62

---

## Total                                    **$2.62**

Your earnings always start with a base rate. Then they're
calculated with time and distance rates specific to your
city, plus any tips and bonuses earned. This total will
also include any additional tolls. You can see this ride's
rates here.

## Passenger(s) Paid

Ride Payments                               $6.15

---

## Total                                    **$6.15**

This is the total amount the passenger(s) paid, which
varies based on demand and includes any tips, tolls,
third-party fees, and the Service Fee.

## Lyft Received

Lyft Platform Fee                           $0.88

Service Fee                                 $2.65

---

## Total                                    **$3.53**

If this total is positive, it goes toward growing the Lyft
business and increasing demand for your rides. If it's
negative, we're covering the difference between your
earnings and what your passenger(s) paid.

▪▫ Boost 📶                    10:38 PM                    ⬈ ✳ 69% 🔋
                              🔒 lyft.com

☰                              **lyft**                           

# Sep 02 2018 - 10:24 PM

# $2.62



○ **10:25 PM Pick-up**
  Requested at 10:24 PM

○ **10:29 PM Drop-off**

## You Received

Earnings                                              $2.62

---

## Total                                           **$2.62**

Your earnings always start with a base rate. Then they're
calculated with time and distance rates specific to your
city, plus any tips and bonuses earned. This total will

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ANTHONY OLIVER,

**DEFENDANTS**

Lyft, Inc., a California Corporation, et al.,

**(b)** County of Residence of First Listed Plaintiff   Chatham
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   San Francisco
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Anthony Oliver., Plaintiff Pro Se
1502 Benton Blvd, # 5108
Savannah, Georgia 31407 (Tel: 912-220-5842)

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT

- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY

- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS

- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS

**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY

- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR

- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION

- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY

- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS

- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY

- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS

- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES

- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
The Sherman Act, 15 U.S.C. § 1
Brief description of cause:
Violation of Federal Antitrust Law

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   DOCKET NUMBER

DATE
09/07/2018

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE

DUPLICATE

Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611136509
Cashier ID: almaceh
Transaction Date: 09/07/2018
Payer Name: anthony oliver

CIVIL FILING FEE
 For: anthony oliver
 Case/Party: D-CAN-3-18-CV-005505-001
 Amount:        $400.00

PAPER CHECK CONVERSION
 Check/Money Order Num: 25379610491
 Amt Tendered:   $400.00

Total Due:       $400.00
Total Tendered:  $400.00
Change Amt:      $0.00

LB


Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution on which
it was drawn.